# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| **AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | |
| **JOSH STEIN, in his official capacity as Attorney General of the State of North Carolina; and SATANA DEBERRY, in her official capacity as District Attorney of the 16th prosecutorial district; AVERY MICHELLE CRUMP, in her official capacity as District Attorney of the 24th prosecutorial district; and LORRIN FREEMAN, in her official capacity as District Attorney of the 10th prosecutorial district, and as representatives of a class of all district attorneys in the state of North Carolina,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Civil Action No. 1:23-cv-302**<br><br>**Complaint – Class Action** |
| **Defendants.** | | |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

## NATURE OF THE ACTION

1.     This action challenges multiple provisions of N.C. Gen. Stat § 14-288.2 (the "Anti-Riot Act" or "Act") as facially unconstitutional. Amended and

1

expanded in March 2023 in response to recent mass protests against police killings of Black people, the Anti-Riot Act impermissibly criminalizes North Carolinians who exercise their fundamental free speech, assembly, and petitioning rights. The Act violates the First and Fourteenth Amendments to the United States Constitution and article I, sections 12, 14, and 19 of the North Carolina Constitution.

2.      Multiple provisions of the current Anti-Riot Act, all of which were re-enacted in March 2023, proscribe "urg[ing] another to engage in a riot." N.C. Gen. Stat §§ 14-288.2(d)-(e). Amendments to the Anti-Riot Act, which take effect on December 1, 2023, also include an additional provision subjecting an individual who "urges another to engage in a riot" to criminal liability. North Carolina Session Law 2023-6, Section 1 (to be codified as N.C. Gen. Stat. § 14-288.2(e1)).

3.      All of these "urging provisions" target mere advocacy of unlawful conduct in violation of the First Amendment as interpreted in *Brandenburg v. Ohio*, 395 U.S. 444 (1969). For this precise reason, the Fourth Circuit held a nearly identical provision of the federal Anti-Riot Act facially unconstitutional. *See United States v. Miselis*, 972 F.3d 518, 538 (4th Cir. 2020).

4.      Further, the entire Anti-Riot Act rests on an overbroad definition of what constitutes a "riot." Under the Act, a riot is defined as an "assemblage

2

of three or more persons which by disorderly and violent conduct, or the imminent threat of disorderly and violent conduct, results in injury or damage to persons or property or creates a clear and present danger of injury or damage to persons or property." N.C. Gen. Stat. § 14-288.2(a) (the "definitional provision").

5. This definition means that a participant in a larger "assemblage" where violence or property damage occurs need not have personally incited, engaged in, threatened, or aided and abetted violence or property damage to be held criminally and civilly liable. It criminalizes mere participation in a demonstration—as well as other activities that North Carolinians have a fundamental constitutional right to engage in—where some members of the group threaten or cause property damage or violence. North Carolinians could be arrested and prosecuted under the Act even if their own actions were entirely peaceful.

6. The legislators who voted on House Bill 40 ("H.B. 40"), the 2023 bill that amended the Anti-Riot Act, were directly and repeatedly warned that the Act infringed upon fundamental constitutional rights and conflicted with Fourth Circuit precedent. Yet rather than using H.B. 40 to fix the Act's constitutional deficiencies, legislators abdicated their duty to follow the law. Senate Leader Phil Berger invited North Carolinians concerned about the

state and federal constitutions to sue, stating "[t]hat's why they build courthouses—to resolve those issues."[1]

7.     Plaintiff American Civil Liberties Union of North Carolina (ACLU-NC) brings this action on behalf of itself and its members for declaratory and injunctive relief under the United States and North Carolina Constitutions and 42 U.S.C. § 1983. Plaintiff seeks to enjoin the urging provisions of the Act in their entirety, and to enjoin application of the Act, through its definitional provision, to the conduct of individuals who do not themselves incite, engage in, threaten, or aid and abet violence or property damage.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case arises under the United States Constitution and laws of the United States; and pursuant to 28 U.S.C. § 1343 because this action seeks to redress the deprivation, under color of state law, of Plaintiff's civil rights and to secure equitable relief for the violation of those rights.

9.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

---

[1] Laura Leslie, *NC legislature approves riot penalties bill, setting up possible veto showdown with Cooper*, WRAL News (Mar. 9, 2023), https://www.wral.com/n-carolina-senate-bill-toughening-riot-punishments-advances/20754949/.

4

10. This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c). Plaintiff's members and employees regularly engage in expressive and associative activities, including encouraging, organizing, and participating in public protests, in this District. Many of Plaintiff's members and employees live and/or work in this District. All defendants are residents of North Carolina and Defendant Deberry and Defendant Crump reside in and are tasked with carrying out the duties of their respective offices in this District.

## PARTIES

### Plaintiff and its Members

12. Plaintiff is a statewide, 501(c)(4) nonprofit, nonpartisan affiliate of the ACLU with approximately 21,000 members in North Carolina. Plaintiff's mission is to defend the civil and constitutional rights of all North Carolinians, including the free speech, assembly, and petitioning rights guaranteed by the state and federal constitutions, through educational programs, public statements, legislative advocacy, and mass mobilization.[2]

---

[2] Plaintiff American Civil Liberties Union of North Carolina is a separate organization from the ACLU of North Carolina Legal Foundation, a 501(c)(3) organization that coordinates and carries out legal and educational work around civil liberties issues.

5

13.     In furtherance of Plaintiff's mission, ACLU-NC members and employees regularly encourage, organize, and participate in public protests and demonstrations throughout North Carolina, including within this District.

14.     For example, in the summer of 2020, Plaintiff's Executive Director urged ACLU-NC members and employees to engage in peaceful protests against police violence as part of Plaintiff's commitment to advocating for racial justice. ACLU-NC members and employees attended protests throughout the state, including in Durham, Raleigh, and Charlotte. During this time, Plaintiff "collaborated with advocates and activists to demonstrate and resist how white supremacy systematically shapes the experiences of Black people in the U.S., exposing them to premature death."[3]

15.     As another example, for at least the past three years, several ACLU-NC employees have organized, attended, and promoted the annual Vigil for Freedom and Racial Justice on the sidewalks outside the Governor's Mansion in Raleigh. The Vigil takes place from December 1 through January 1, during which time groups of three or more demonstrators stand, sit, or walk

---

[3] Liberty: ACLU of North Carolina Newsletter, *How George Floyd's Murder Changed Us* (Spring / Summer 2021), https://www.acluofnorthcarolina.org/sites/default/files/field_documents/aclu_newsletter_spring-summer_2021.pdf.

6

on the sidewalks surrounding the Governor's mansion to protest the Governor's underutilization of his clemency and pardon powers.

16.     ACLU-NC staff members have also conducted "know your rights" trainings for protestors and served as legal observers at public protests and demonstrations.

17.     Plaintiff, its employees, and its members regularly use social media platforms to encourage public protests and demonstrations against policies that violate North Carolinians' civil and constitutional rights. They intend to engage in similar activities in the coming weeks and months to advocate for North Carolinians' civil and constitutional rights, and particularly to oppose ongoing legislative efforts to curtail abortion rights, voting rights, and immigrant rights.

18.     In the coming weeks, Plaintiff will use its social media platforms to encourage its members and the public to participate in the Moral Monday 10-Year Anniversary and Recommitment Rally, organized by Repairers of the Breach (April 24, 2023); the Immigrant Day of Action, organized by the Immigrants' Rights Alliance of North Carolina (April 25, 2023); and the Second Chance Lobby Day, organized by North Carolina's Second Chance Alliance (May 2, 2023). It is substantially likely that ACLU-NC members and employees will also participate in these planned demonstrations.

7

19.    Plaintiff, its employees, and its members regularly coordinate with community members, activists, and other advocacy organizations to organize public protests and demonstrations against policies that violate North Carolinians' civil and constitutional rights. They intend to engage in similar activities in the coming days, weeks, and months to advocate for North Carolinians' civil and constitutional rights.

20.    Plaintiff, its employees, and its members regularly participate in public protests and demonstrations against policies that violate North Carolinians' civil and constitutional rights. They intend to engage in similar activities in the coming days, weeks, and months to advocate for North Carolinians' civil and constitutional rights.

21.    For example, Jaelyn Miller, an ACLU-NC member since 2022, regularly receives notices and information from Plaintiff about civil rights issues. Frequently, those messages encourage participation in protests and demonstrations in support of civil rights at public locations in North Carolina. Since joining ACLU-NC, Jaelyn has attended at least four public protests or gatherings in support of civil rights issues, including two marches in Raleigh opposing the U.S. Supreme Court's decision to overturn *Roe v. Wade*, a march in Raleigh protesting the Raleigh Police Department's killing of Darryl Tyree Williams, and a demonstration opposing House Bill 10, which would require

8

local sheriffs to cooperate with U.S. Immigration and Customs Enforcement. Jaelyn plans to attend similar protests and gatherings in the future.

22.     Jillian Brevorka, an ACLU-NC member since 2014, also regularly receives notices and information from Plaintiff about civil rights issues. Frequently, those messages encourage participation in protests and demonstrations in support of civil rights at public locations in North Carolina. Since joining ACLU-NC, Jillian has attended multiple public protests or gatherings in Greensboro in support of civil rights issues, including protests against the death penalty and in support of the Black Lives Matter movement and abortion rights. Jillian plans to attend similar protests and gatherings in the future, including demonstrations in support of abortion rights and LGBTQ+ equality.

23.     ACLU-NC employees regularly participate in public protests and demonstrations in the course of their employment with Plaintiff as a tactic for advancing Plaintiff's organizational mission. For some employees, encouraging, organizing, and participating in public demonstrations is a central component of their jobs.

24.     Plaintiff regularly expends organizational resources in the form of staff time, funding, and purchased materials to support public protests and

demonstrations throughout North Carolina. Plaintiff has purchased and distributed posters, t-shirts, flyers, and other materials to protestors.

25.     For example, when Andrew Brown, a Black man, was killed by Pasquotank County sheriff's deputies in 2021, ACLU-NC employees traveled to Elizabeth City to help organize protests in the community. There, staff conducted "know your rights" trainings and participated in public protests.

26.     Plaintiff has a direct and immediate interest, on behalf of its organization and its members, in ensuring that North Carolinians' free speech, assembly, and petitioning rights remain vibrant.

27.     The ability of Plaintiff, its employees, and its members to encourage, organize, and participate in public protests is crucial to furthering Plaintiff's organizational mission. The challenged provisions of the Anti-Riot Act impede Plaintiff's ability to engage in these activities.

28.     Plaintiff has expended and will continue to expend resources to address the potential liability of itself, its employees, and its members under the Anti-Riot Act. In addition, Plaintiff's employees have been and will be required to respond to inquiries from ACLU-NC members and the broader community regarding their potential liability under the Act.

29.     Plaintiff, its members, and its employees will adjust their plans to encourage, organize, and participate in peaceful protests and

10

demonstrations—and may choose to forego protesting and demonstrating entirely under certain circumstances—to account for the possibility of being arrested and prosecuted under the Act.

30.     The time and effort Plaintiff's employees have expended and will continue to expend to address their potential liability under the Act directly reduces its capacity to plan events and programming consistent with its organizational mission.

31.     Plaintiff must consider the risk that peaceful protestors could face liability under the Act, because encouraging, organizing, and participating in peaceful protests and demonstrations are principal tactics that Plaintiff utilizes to advance its organizational mission.

32.     Plaintiff will likely pay the defense costs for any employee charged with violating the Anti-Riot Act in the course of encouraging, organizing, or participating in a public protest in the course of that employee's duties.

33.     Indeed, Plaintiff has paid such costs for an employee arrested while protesting in recent years. ACLU-NC employees have been arrested while participating in public protests or demonstrations on at least two occasions over the past three years, causing ACLU-NC management to divert significant funds and time to inquire into the circumstances surrounding the arrests and to support wrongfully arrested employees.

34.     As a result of the unconstitutional overbreadth and vagueness of the Anti-Riot Act, Plaintiff, its employees, and its members fear that as they continue exercising their free speech, assembly, and petitioning rights by engaging in public protests and demonstrations, they risk prosecution and arrest under the Act.

## Defendants

35.     Josh Stein is the elected Attorney General of the State of North Carolina. Defendant Stein, in his official capacity as Attorney General, is obligated to defend the interests of the State in all criminal and civil matters. *See* N.C. Gen. Stat. § 114-2(1); N.C. Gen. Stat. § 114-6. In addition, Defendant Stein is tasked with deploying and supervising special prosecutors to assist elected district attorneys in the prosecution of any criminal matter upon a district attorney's request. N.C. Gen. Stat. § 114-11.6.

36.     Satana Deberry is the elected District Attorney for North Carolina's 16th prosecutorial district, encompassing Durham County. Defendant Deberry, in her official capacity as District Attorney, is responsible for prosecuting misdemeanor and felony violations of North Carolina's criminal laws that occur within her district, including violations of the Anti-Riot Act. N.C. Gen. Stat. § 7A-61.

12

37. Avery Michelle Crump is the elected District Attorney for North Carolina's 24th prosecutorial district, encompassing Guilford County. Defendant Crump, in her official capacity as District Attorney, is responsible for prosecuting misdemeanor and felony violations of North Carolina's criminal laws that occur within her district, including violations of the Anti-Riot Act. N.C. Gen. Stat. § 7A-61.

38. Lorrin Freeman is the elected District Attorney for North Carolina's 10th prosecutorial district, encompassing Wake County. Defendant Freeman, in her official capacity as District Attorney, is responsible for prosecuting misdemeanor and felony violations of North Carolina's criminal laws that occur within his district, including violations of the Anti-Riot Act. N.C. Gen. Stat. § 7A-61.

**Defendant Class Action Allegations**

39. This action is maintainable as a class action under Rule 23(b)(1) of the Federal Rules of Civil Procedure against a defendant class of all district attorneys in North Carolina. Each of the class members has identical statutory authority to prosecute misdemeanors and felonies as to which any element of an offense occurs within his or her jurisdiction, including violations of the Anti-Riot Act.

13

40. Upon information and belief, there are approximately 43 elected district attorneys with authority to enforce the Anti-Riot Act. Therefore, the class is so numerous that the joinder of all members is impracticable.

41. The questions of law and fact which Plaintiff seeks to litigate, namely the constitutionality of provisions of the Anti-Riot Act, are common to all members of the defendant class.

42. The claims or defenses of Defendant Deberry, Defendant Crump, and Defendant Freeman will be typical of the claims and defenses of the class in that they involve the constitutionality of the same provisions of the same statute which all district attorneys are constitutionally and statutorily authorized to enforce.

43. Defendant Deberry, Defendant Crump, and Defendant Freeman will fairly and adequately represent the interests of the class. Their positions as District Attorneys for the 16th, 24th, and 10th prosecutorial districts place them in essentially the same position with respect to this challenge as all other members of the class because the functions of all prosecuting attorneys with respect to this statute are substantially the same.

44. This case may be maintained as a class action under Rule 23(a) and Rule 23(b)(1)(A) & (B) because the prosecution of separate actions against individual members of the defendant class would create a risk of inconsistent

14

or varying adjudications which would establish incompatible standards of conduct for Plaintiff, its members, and its employees depending on the prosecutorial district in which they organize or participate in demonstrations. Adjudications with respect to individual members of the defendant class would also be practically dispositive of the interests of other non-party class members, as the reasoning and result of the Court's disposition of Plaintiff's claims would be equally applicable to enforcement of the Anti-Riot Act in any prosecutorial district within North Carolina.

## **FACTUAL ALLEGATIONS**

45.     North Carolina's Anti-Riot Act ("the Act") was initially enacted in 1969 in the midst of that era's civil rights movement and student-led demonstrations against the Vietnam War. *See* North Carolina Session Law 1969-869.

46.     The Act was one of many laws enacted in North Carolina around this time to crack down on protests and demonstrations. *See, e.g.*, North Carolina Session Law 1969-740 (act to increase punishment "for demonstrations or assemblies of persons kneeling or lying down in public buildings"); North Carolina Session Law 1969-860 (act to restrict access to university campuses and regulate use of sound amplification devices).

15

47.     The Act was not significantly amended or expanded for 54 years, until 2023.

**2020 Protests Responding to Killings of Unarmed Black People**

48.     On February 23, 2020, Ahmaud Arbery, a 25-year-old Black man, was murdered while jogging in Glynn County, Georgia. Local officers initially failed to apprehend the perpetrators, three white men, who were only arrested after a video of his killing was released to the public that May.

49.     On March 13, 2020, Breonna Taylor, a 26-year-old Black medical worker from Louisville, Kentucky, was shot and killed by police while she was sleeping. Officers fired on her bedroom during a police raid targeting someone who did not live in and was not present in her apartment.

50.     On May 25, 2020, George Floyd, a 46-year-old Black man, was murdered by a Minneapolis Police Department officer who knelt on Mr. Floyd's neck for nearly nine minutes. Mr. Floyd died as three other officers looked on.

51.     These three killings, in the context of historical and ongoing police violence directed at Black communities, sparked worldwide protests in support of the Black Lives Matter movement. In North Carolina, thousands of residents demonstrated in cities and towns across the state.

52.     The vast majority of individuals who demonstrated in the summer of 2020, in North Carolina and nationwide, engaged in lawful, peaceful

protests.[4] However, there were isolated instances of violence, looting, and property damage. Individuals deemed responsible for those acts were arrested and prosecuted under existing laws, including the Anti-Riot Act.

53. Nevertheless, media coverage frequently emphasized incidents of unlawful behavior that occurred at racial justice protests, regardless of the prevalence of such incidents or the relationship between their perpetrators and the broader movement. Some politicians and elected officials followed suit, exploiting sensationalist accounts of supposedly widespread looting and rioting in an attempt to discredit the Black Lives Matter movement and its aims.

54. In some instances, law enforcement officers responded to peaceful protests with violence, unlawful arrests, and discriminatory enforcement targeted at nonviolent protestors. *See, e.g.*, *Epps v. City & Cnty. of Denver*, 588 F. Supp. 3d 1164, 1176 (D. Colo. 2022) ("Plaintiffs present evidence that they did not engage in destructive activity, and that many officers used force in situations that support an inference of retaliatory motive, such as tear gassing kneeling protestors chanting 'Hands Up Don't Shoot' or shooting a plaintiff through her 'Black Lives Matter' sign."); *Alsaada v. City of Columbus*, 536 F.

---

[4] *See Demonstrations and Political Violence in America: New Data for Summer 2020*, The Armed Conflict Location & Event Data Project (ACLED) (Sep. 3, 2020), https://acleddata.com/2020/09/03/demonstrations-political-violence-in-america-new-data-for-summer-2020/.

17

Supp. 3d 216, 269 (S.D. Ohio 2021) ("The use of force on nonviolent protestors . . . raises a serious question if officers acted in reaction to the protests' antipolice message and aimed to intimidate protestors to deter such speech. This is especially so because the allegations and evidence submitted appear to show that at least some Plaintiffs—peaceful protestors or passersby—were targeted and *not* inadvertently hit.").

55.     Notwithstanding politicians' and the media's mischaracterization of the Black Lives Matter movement protests, across the country "[t]he vast majority of citations and charges against George Floyd protesters were ultimately dropped, dismissed or otherwise not filed."[5]

**A provision of the Federal Anti-Riot Act is held unconstitutional.**

56.     In the aftermath of George Floyd's murder, the federal government signaled its intent to crack down on racial justice protestors. Then-United States Attorney General William Barr promised that the Department of Justice would use 18 U.S.C. § 2101, the federal Anti-Riot Act, to combat what

---

[5] Tom Perkins, *Most charges against George Floyd protesters dropped, analysis shows*, The Guardian (Apr. 17, 2021), https://www.theguardian.com/us-news/2021/apr/17/george-floyd-protesters-charges-citations-analysis.

he claimed was "violence . . . planned, organized, and driven by far[-]left extremist groups and anarchic groups using Antifa-like tactics."[6]

57.    The federal Anti-Riot Act makes it a crime to travel or use facilities of interstate commerce to, *inter alia*, "incite," "organize, promote, encourage, participate in, or carry on a riot." 18 U.S.C. §§ 2101(a)(1)-(2). Another provision defines these terms to "include[] . . . *urging* or instigating other persons to riot." 18 U.S.C. § 2102(b) (emphasis added).

58.    In 2020 the Fourth Circuit concluded that the federal Anti-Riot Act violated the First Amendment "insofar as it proscribes speech tending to 'encourage' or 'promote' a riot . . . as well as speech 'urging' others to riot or 'involving' mere advocacy of violence." *United States v. Miselis*, 972 F.3d 517, 540 (4th Cir. 2020).

### First attempt to amend the NC Anti-Riot Act.

59.    In response to the Black Lives Matter movement and related mass protests against police killings of Black people, some North Carolina elected officials responded by proposing sweeping limits on protest rights in the 2021 legislative session.

---

[6] Josh Gerstein & Evan Semones, *Barr threatens to bust 'far-left extremist groups' in Floyd unrest*, Politico (May 30, 2020), https://www.politico.com/news/2020/05/30/william-barr-george-floyd-protests-290792.

19

60.     Legislators invoked recent racial justice demonstrations to justify efforts to broaden the reach of the Anti-Riot Act and increase its penalties for acts of violence and property damage—acts that were already criminal and redressable by civil claims under existing law.

61.     These efforts were sometimes couched in explicitly racist terms. In a Facebook post, one sitting North Carolina legislator referred to Black Lives Matter protestors as "ignorant thugs," "vermin," and a "lawless, godless mob," before calling for "law enforcement to get tough with these criminals." Another sitting legislator responded to the protests by calling for "A MAJOR LEAGUE GOVERNMENT CRACKDOWN TO SHOW THESE THUGS THIS WILL NOT BE TOLERATED," characterizing the Black Lives Matter movement as "an organized, well[-]funded, Mob Rule effort to destroy our nation by Marxists" and describing protestors as "not true Americans."[7]

62.     These efforts initially resulted in House Bill 805, which amended the Anti-Riot Act to increase criminal penalties and authorize a private cause of action against violators of the Act. On September 10, 2021, Governor Cooper

---

[7] *See* James Walker, *In North Carolina, Key 2020 Swing State, GOP Lawmaker Calls BLM 'Vermin'*, Newsweek (June 17, 2020), https://www.newsweek.com/north-carolina-republican-lawmaker-black-lives-matter-protesters-vermin-1511381; Carolina Forward, *The dark, sad swamp of Bob Steinburg's Facebook Page* (June 29, 2020), https://medium.com/@CarolinaForward/the-dark-sad-swamp-of-bob-steinburgs-facebook-page-3e127859898e.

vetoed House Bill 805, stating that amendments to the Act were "unnecessary and . . . intended to intimidate and deter people from exercising their constitutional rights to peacefully protest."[8] This veto was not overridden.

### Second attempt to amend the NC Anti-Riot Act.

63. In early 2023, North Carolina legislators once again sought to amend the Anti-Riot Act. On February 1, 2023, House Speaker Timothy Moore filed House Bill 40 ("H.B. 40"), the contents of which were largely identical to 2021's House Bill 805.

64. Despite the Fourth Circuit's decision in *Miselis*, H.B. 40 did not alter or remove the existing urging provisions of the Anti-Riot Act. Instead, H.B. 40 doubled down on language the Fourth Circuit had declared unconstitutional, adding a new provision stating that anyone who "urges another to engage in a riot . . . shall be guilty of a Class D felony" if "such . . . urging causes a death." *See* North Carolina Session Law 2023-6, Section 1 (to be codified as N.C. Gen. Stat. § 14-288.2(e1)).

65. H.B. 40 makes individuals who violate any provision of the Act, including its urging provisions, liable to those injured in a riot for treble

---

[8] *Governor Roy Cooper Veto Message: House Bill 805* (Sep. 10, 2021), https://webservices.ncleg.gov/ViewBillDocument/2021/53069/0/H805-BD-NBC-9176.

damages. *See* North Carolina Session Law 2023-6, Section 1 (to be codified as N.C. Gen. Stat. § 14-288.2(f)).

66.     H.B. 40 also repeats the broad, pre-existing definition of "riot" that would apply to a person who encourages, organizes, or participates in a peaceful protest, but who does not personally incite, engage in, threaten, or aid and abet violence or property damage, due to another person's violent or injurious acts. North Carolina Session Law 2023-6, Section 1 (to be codified as N.C. Gen. Stat. § 14-288.2(a)).

67.     According to Speaker Moore, the purpose of H.B. 40 was to "enforce[] harsher penalties for the perpetrators of violence and looting, while also preserving every North Carolinian's right to protest peacefully."[9]

68.     However, despite being advised of the Fourth Circuit's decision in *Miselis*, Speaker Moore and other proponents of H.B. 40 refused to take action to ensure that the Anti-Riot Act would respect North Carolinians' free speech, assembly, and petitioning rights and comply with Fourth Circuit precedent defining those rights.

---

[9] Paul Specht, *NC Speaker 'confident' tougher rioting punishments will pass*, WRAL News (Feb. 1, 2023), https://www.wral.com/nc-speaker-confident-tougher-rioting-punishments-will-pass/20699838/.

69.     On March 7, 2023, the North Carolina Senate Judiciary Committee heard testimony from Melissa Price Kromm,[10] director of the non-partisan group NC Voters for Clean Elections. Ms. Kromm explained that "part of the incitement to riot language . . . is likely unconstitutional" under *Miselis*.

70.     No legislator responded to Ms. Kromm's comments, and H.B. 40 was voted out of committee.

71.     Senator Natasha Marcus proposed an amendment removing the urging provisions, warning that H.B. 40 "violates the First Amendment rights of free speech by using overly broad language. If you don't fix it, you'll be triggering years of costly litigation, litigation that the taxpayers of North Carolina will have to pay for, to defend an unconstitutional law."[11]  The Senate tabled Senator Marcus's amendment.

72.     On March 10, 2023, H.B. 40 was presented to Governor Cooper for his signature.

73.     Once again, advocates highlighted the Act's constitutional infirmities. Twenty-nine North Carolina organizations—including Plaintiff—submitted a letter to Governor Cooper explaining that the Anti-Riot Act as

---

[10] In the transcript of the Senate Judiciary Hearing, Ms. Kromm is incorrectly referred to as "Melissa Price Crumb."

[11] Leslie, *supra* note 1.

amended in H.B. 40 "suffers from both overbreadth and vagueness" and that "[t]he language pertaining to 'urging someone else to engage in a riot' is similar to language in the federal anti-riot statute" held unconstitutional in *Miselis*.[12]

74.     Three days later, Governor Cooper allowed H.B. 40 to become law without his signature. He explained that his "continuing concerns about the erosion of the First Amendment and the disparate impacts on communities of color will prevent me from signing this legislation."[13]

### Enforcement of the Anti-Riot Act against protestors.

75.     According to the North Carolina General Assembly's Fiscal Research Division, at least 107 defendants were charged with felony rioting in 2020. At least 56 individuals in North Carolina were charged with felony or misdemeanor rioting in 2022.[14]

---

[12] Letter from Advocacy Organizations to the Honorable Roy Cooper, *Veto House Bill 40 (Preventing Rioting and Civil Disorder)* (Mar. 14, 2023), https://democracync.org/wp-content/uploads/2023/03/HB-40-Veto-Letter.pdf.

[13] *Governor Cooper Lets Two Bills Become Law* (Mar. 17, 2023), https://governor.nc.gov/news/press-releases/2023/03/17/governor-cooper-lets-two-bills-become-law.

[14] *See* Fiscal Research Division, *Legislative Incarceration Fiscal Note: H.B. 805*, North Carolina General Assembly (May 5, 2021), https://www.ncleg.gov/Sessions/2021/FiscalNotes/House/PDF/HIN0805v1.pdf; Fiscal Research Division, *Legislative Incarceration Fiscal Note: H.B. 40*, North Carolina General Assembly (Feb. 7, 2023), https://www.ncleg.gov/Sessions/2023/FiscalNotes/House/PDF/HIN40v1.pdf.

76.     Individuals engaged in lawful protest activities, including demonstrations against racial injustice and police brutality, have been arrested and charged under the Anti-Riot Act in North Carolina in recent years.[15]

77.     Individuals who have engaged in peaceful acts of protest in other states have been arrested and prosecuted under similar laws. *See, e.g.*, *State v. Bearrunner*, 2019 ND 29, ¶ 13, 921 N.W.2d 894, 898 (vacating misdemeanor engaging in a riot conviction because the defendant's "act of locking arms and resisting arrest with other protesters does not rise to the commonly understood definition of violence"); *Rusanowsky v. City of Dallas, et al.*, No. 3:22-CV-01132-K, 2023 WL 2728722, at *2 (N.D. Tex. Mar. 30, 2023) (photojournalist arrested for riot offense while covering protest).

78.     For example, in 2020, a Kentucky State Representative was arrested for felony rioting during a racial justice protest after someone in a crowd threw a flare into a public library.[16] Peaceful protestors in Washington

---

[15] *See, e.g.*, Jordan Green, *'Unlawful arrests': Dozens still face charges from Graham protests over past year*, Triad City Beat (Jan. 7, 2021), https://triad-city-beat.com/unlawful-arrests-charges-graham-protests/.

[16] *See* Bailey Loosemore, *Attica Scott sues Louisville police officers over arrest at Breonna Taylor protest*, Louisville Courier Journal (June 14, 2021), https://www.courier-journal.com/story/news/local/2021/06/14/kentucky-rep-attica-scott-sues-louisville-police-officers-over-arrest/7690585002/; *see also*

D.C. were arrested *en masse* and charged under the federal Anti-Riot Act, but prosecutors dismissed charges against all defendants after failing to obtain any convictions in initial trials, and ultimately agreed to settle claims brought by protestors.[17]

79.     Plaintiff has repeatedly and publicly registered opposition to the Anti-Riot Act and recent efforts to increase its penalties, including H.B. 40, on the grounds that overbroad and vague anti-riot laws have been used to target peaceful protestors and stifle dissent, and that these laws give rise to a risk of selective, discriminatory enforcement. Plaintiff has done so in furtherance of its commitment to preserving and defending North Carolinians' free speech, assembly, and petitioning rights, and also because its employees and members regularly utilize protesting as a tactic to achieve its organizational goals.

---

*Scott v. Louisville/Jefferson Cnty. Metro Gov't*, 503 F. Supp. 3d 532 (W.D. Ky. 2020).

   [17] *See* Sam Adler-Bell, *With last charges against J20 protestors dropped, defendants seek accountability for prosecutors*, The Intercept (July 13, 2018), https://theintercept.com/2018/07/13/j20-charges-dropped-prosecutorial-misconduct/; *see also* Pl. Unopposed Mot. for Expungement, 3, *Horse, et al., v. District of Columbia, et al.,* No. 1:17-cv-01216-ABJ (D.D.C. May 19, 2021) (plaintiffs "were arrested by [law enforcement officers] . . . without probable cause while exercising their First Amendment rights. Indeed, [one officer] . . . testified under oath that when he ordered his officers to detain people, he 'wasn't differentiating who was demonstrating and who was rioting.'"), https://storage.courtlistener.com/recap/gov.uscourts.dcd.187398/gov.uscourts.dcd.187398.98.0.pdf.

## CLAIMS FOR RELIEF

**COUNT ONE**
**VIOLATION OF FREE SPEECH, ASSEMBLY, AND PETITIONING**
**RIGHTS UNDER THE FIRST AND FOURTEENTH AMENDMENTS**
**TO THE UNITED STATES CONSTITUTION**
**(URGING PROVISIONS)**
**42 U.S.C. § 1983**

80.     The foregoing allegations are repeated and incorporated as though fully set forth herein.

81.     On behalf of itself and its members, Plaintiff asserts a claim pursuant to 42 U.S.C. § 1983 for violation of the rights to free speech, assembly, and petitioning protected under the First and Fourteenth Amendments to the United States Constitution.

82.     In the following paragraphs, references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

83.     The First Amendment prohibits the State of North Carolina from, in relevant part, "abridging the freedom of speech . . . or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

84.     The Anti-Riot Act is unconstitutionally overbroad. The Act penalizes and threatens to penalize substantial amounts of protected advocacy

27

and significantly encroaches upon Plaintiff's free speech, assembly, and petitioning rights, in violation of the First Amendment.

85. The urging provisions of the Anti-Riot Act, N.C. Gen. Stat. §§ 14-288.2(d)-(e) and North Carolina Session Law 2023-6, Section 1 (to be codified as N.C. Gen. Stat. § 14-288.2(e1)), criminalize speech that is protected by the First Amendment. Specifically, the urging provisions of the Act impermissibly target "speech having a mere tendency to encourage others to riot." *Miselis*, 972 F.3d at 536 (citing *Brandenburg*, 395 U.S. at 444). These provisions "encompass[] the sort of advocacy that *Brandenburg* 'jealously protects.'" *Id.* at 533 (quoting *Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 262 (4th Cir. 1997)).

86. The Act has resulted in irreparable constitutional harm by chilling, and threatening to chill, the protected speech, assembly, and petitioning rights of Plaintiff. The Act discourages would-be protesters from encouraging, organizing, or participating in a protest for fear that their actions may be construed as violating the urging provisions.

87. Each of the Defendants is responsible for enforcing the Act.

88. Defendants have acted and will act under color of state law to deprive Plaintiff, its employees, and its members of their First Amendment rights through their enforcement of the Anti-Riot Act.

28

## COUNT TWO
## VIOLATION OF FREE SPEECH, ASSEMBLY, AND PETITIONING
## RIGHTS UNDER THE FIRST AND FOURTEENTH AMENDMENTS
## TO THE UNITED STATES CONSTITUTION
## (DEFINITIONAL PROVISION)
## 42 U.S.C. § 1983

89.     The foregoing allegations are repeated and incorporated as though fully set forth herein.

90.     On behalf of itself and its members, Plaintiff asserts a claim pursuant to 42 U.S.C. § 1983 for violation of the rights to free speech, assembly, and petitioning protected under the First and Fourteenth Amendments to the United States Constitution.

91.     The definitional provision of the Anti-Riot Act, N.C. Gen. Stat. § 14-288.2(a), is overbroad in violation of the First and Fourteenth Amendments.

92.     Under the definitional provision, an individual who encourages, organizes, or participates in a protest, but who does not personally incite, engage in, threaten, or aid and abet violence or property damage, may be held liable under the Act if they are in proximity to an act of violence or property destruction. Thus, the definitional provision impermissibly criminalizes the protected activities of non-violent protestors who choose to peacefully exercise their right to protest, directly targeting their constitutionally-protected speech and expressive conduct.

29

93.     The definitional provision has resulted in irreparable constitutional harm by chilling, and threatening to chill, the protected speech, assembly, and petitioning rights of Plaintiff.

94.     The Act discourages would-be protesters from participating in a demonstration for fear of being ensnared by a definitional provision which, by its plain terms, endorses a "guilt by association" theory of liability and would apply to an individual who participates in a demonstration where someone else destroys property or causes injury, regardless of that individual's own actions or intentions. *See, e.g.*, *Healy v. James*, 408 U.S. 169, 186 (1972) ("'[G]uilt by association alone, without (establishing) that an individual's association poses the threat feared by the Government,' is an impermissible basis upon which to deny First Amendment rights." (quoting *United States v. Robel*, 389 U.S. 258, 265 (1967))).

95.     Each of the Defendants is responsible for enforcing the Act.

96.     Defendants have acted and will act under color of state law to deprive Plaintiff, its employees, and its members of their First Amendment rights through their enforcement of the Anti-Riot Act.

**COUNT THREE**
**VIOLATION OF DUE PROCESS RIGHTS UNDER THE**
**FOURTEENTH AMENDMENT TO THE**
**UNITED STATES CONSTITUTION**
**(DEFINITIONAL PROVISION)**
**42 U.S.C. § 1983**

30

97.     The foregoing allegations are repeated and incorporated as though fully set forth herein.

98.     The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits the State of North Carolina from "depriv[ing] any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1.

99.     A state violates the Due Process Clause "by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).

100.    The definitional provision of the Anti-Riot Act, N.C. Gen. Stat. § 14-288.2(a), is impermissibly vague because it fails to provide a person of ordinary intelligence fair notice of what is prohibited, and is so standardless that it authorizes arbitrary and discriminatory enforcement of the Act.

101.    The definitional provision is vague because it fails to provide fair notice to ordinary people seeking to exercise their right to protest regarding their exposure to potential criminal and civil liability by merely being a part of a demonstration where violence or property destruction occurs. The definitional provision invites arbitrary and discriminatory enforcement by

31

conferring discretion on law enforcement to arrest nonviolent protestors in close proximity to an act of violence or property damage committed by others.

102. Plaintiff, its employees, and its members have already been and will continue to be discouraged from participating in demonstrations for fear that the intent and actions of others may subject them to arbitrary enforcement and severe criminal penalties under the Act, due to the overbroad and vague definition of a riot in the definitional provision.

103. Because the Act is vague and standardless, it results in irreparable constitutional harm by violating Plaintiff's constitutional rights to due process under the Fourteenth Amendment.

104. Each of the Defendants is responsible for enforcing the Act.

105. Defendants have acted and will act under color of state law to deprive Plaintiff, its employees, and its members of their First Amendment rights through their enforcement of the Anti-Riot Act.

## COUNT FOUR
## VIOLATION OF SPEECH, ASSEMBLY, AND PETITIONING RIGHTS UNDER ARTICLE I, SECTION 12 OF THE NORTH CAROLINA CONSTITUTION (URGING AND DEFINITIONAL PROVISIONS)

106. The foregoing allegations are repeated and incorporated as though fully set forth herein.

32

107. On behalf of itself and its members, Plaintiff asserts a claim arising under article I, section 12 of the North Carolina Constitution.

108. Article I, section 12 provides in relevant part: "The people have a right to assemble together to consult for their common good, to instruct their representatives, and to apply to the General Assembly for redress of grievances."

109. This provision protects "the ability of [North Carolina's] citizenry to be informed about government action and to express their views about that action" and "to contact their elected representatives and convey their views about the decisions those representatives are tasked with making on their behalf." *Common Cause v. Forest*, 269 N.C. App. 387, 393 (2020). "The right to petition the government [as guaranteed by Article I, section 12] is a fundamental right." *Cheryl Lloyd Humphrey Land Inv. Co., LLC v. Resco Prod., Inc.*, 377 N.C. 384, 390 (2021).

110. This provision is textually broader, and provides greater protections, than its federal counterpart.

111. The Anti-Riot Act violates Plaintiff's, its employees', and its members' rights to assemble, petition elected officials, and express views on matters of public concern as guaranteed by article I, section 12 of the North Carolina Constitution.

112. The urging provisions of the Anti-Riot Act, N.C. Gen. Stat. §§ 14-288.2(d)-(e1) and North Carolina Session Law 2023-6, Section 1 (to be codified as N.C. Gen. Stat. § 14-288.2(e1)), encompass speech that Plaintiff and its members have a constitutional right to communicate.

113. The definitional provision of the Anti-Riot Act, N.C. Gen. Stat. § 14-288.2(a), threatens Plaintiff, its employees, and its members with criminal liability for engaging in protected expressive activities such as engaging in peaceful protests and demonstrations.

114. The overbreadth of the Anti-Riot Act causes Plaintiff, its employees, and its members irreparable harm by chilling the exercise of their fundamental constitutional rights.

115. Defendants act under color of state law to deprive Plaintiff, its employees, and its members of their rights under article I, section 12 of the North Carolina Constitution.

116. Plaintiff lacks an adequate state common law or statutory remedy to recover for a violation of its state constitutional right to free speech. *See Corum v. Univ. of N. Carolina Through Bd. of Governors*, 330 N.C. 761, 783 (1992).

## COUNT FIVE
## VIOLATION OF FREE SPEECH AND PROTEST RIGHTS
## UNDER ARTICLE I, SECTION 14 OF THE

34

## NORTH CAROLINA CONSTITUTION
## (URGING AND DEFINITIONAL PROVISIONS)

117.     The foregoing allegations are repeated and incorporated as though fully set forth herein.

118.     On behalf of itself and its members, Plaintiff asserts a claim arising under article I, section 14 of the North Carolina Constitution.

119.     Article I, section 14 provides in relevant part: "Freedom of speech and of the press are two of the great bulwarks of liberty and therefore shall never be restrained."

120.     This provision is "a direct personal guarantee of each citizen's right of freedom of speech," comprising "one of the fundamental cornerstones of individual liberty and one of the great ordinances of [the North Carolina] Constitution." *Corum v. Univ. of N. Carolina Through Bd. of Governors*, 330 N.C. 761, 781 (1992). "Freedom of speech and protest against the administration of public affairs . . . is a fundamental right which has been cherished in this State since long before the adoption of the Fourteenth Amendment to the United States Constitution." *State v. Wiggins*, 272 N.C. 147, 157, 158 S.E.2d 37, 45 (1967).

121.     This provision is textually broader, and provides greater protections, than its federal counterparts.

35

122. The urging provisions of the Anti-Riot Act, N.C. Gen. Stat. §§ 14-288.2(d)-(e1) and North Carolina Session Law 2023-6, Section 1 (to be codified as N.C. Gen. Stat. § 14-288.2(e1)), encompass speech that Plaintiff and its members have a constitutional right to communicate.

123. The definitional provision of the Anti-Riot Act, N.C. Gen. Stat. § 14-288.2(a), threatens Plaintiff, its employees, and its members with criminal liability for engaging in protected speech and expressive conduct such as engaging in peaceful protests and demonstrations.

124. The overbreadth of the Anti-Riot Act causes Plaintiff, its employees, and its members irreparable harm by chilling the exercise of their fundamental rights to communicate speech and protest governmental actions as guaranteed by article I, section 14.

125. Defendants act under color of state law to deprive Plaintiff, its employees, and its members of their rights under article I, section 14 of the North Carolina Constitution.

126. Plaintiff lacks an adequate state common law or statutory remedy to recover for a violation of its state constitutional right to free speech. *See Corum v. Univ. of N. Carolina Through Bd. of Governors*, 330 N.C. 761, 783 (1992).

**COUNT SIX**
**VIOLATION OF DUE PROCESS RIGHTS**

36

## UNDER ARTICLE I, SECTION 19 OF THE
## NORTH CAROLINA CONSTITUTION
## (DEFINITIONAL PROVISION)

127.     The foregoing allegations are repeated and incorporated as though fully set forth herein.

128.     On behalf of itself and its members, Plaintiff asserts a claim arising under article I, section 19 of the North Carolina Constitution.

129.     Article I, section 19 provides in relevant part: "No person shall be taken, imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner deprived of his life, liberty, or property, but by the law of the land."

130.     Under article I, section 19, a criminal law is void for vagueness if "'men of common intelligence' cannot know 'what conduct on their part will render them liable to its penalties.'" *State v. Rose*, 312 N.C. 441, 444 (1984) (quoting *Surplus Store, Inc. v. Hunter*, 257 N.C. 206, 211 (1962)).

131.     The definitional provision of the Anti-Riot Act, N.C. Gen. Stat. § 14-288.2(a), is impermissibly vague because it fails to provide a person of ordinary intelligence fair notice of what is prohibited, and is so standardless that it authorizes arbitrary and discriminatory enforcement of the Act.

132.     The definitional provision is vague because it fails to provide fair notice to ordinary people seeking to exercise their right to protest regarding

37

their exposure to potential criminal and civil liability by merely being a part of a demonstration where violence or property destruction occurs. The definitional provision invites arbitrary and discriminatory enforcement by conferring discretion on law enforcement to arrest nonviolent protestors in close proximity to an act of violence or property damage committed by others.

133. Plaintiff, its employees, and its members have already been and will continue to be discouraged from participating in demonstrations for fear that the intent and actions of others may subject them to arbitrary enforcement and severe criminal penalties under the Act, due to the overbroad and vague definition of a riot in the definitional provision.

134. Because the Act is vague and standardless, it results in irreparable constitutional harm by violating Plaintiff's constitutional rights to due process under the Fourteenth Amendment.

135. Defendants act under color of state law to deprive Plaintiff, its employees, and its members of their rights under article I, section 19 of the North Carolina Constitution.

136. Plaintiff lacks an adequate state common law or statutory remedy to recover for a violation of its state constitutional right to free speech. *See Corum v. Univ. of N. Carolina Through Bd. of Governors*, 330 N.C. 761, 783 (1992).

38

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court grant the following relief:

(a) Preliminarily enjoin enforcement of the urging provisions of the Anti-Riot Act;

(b) Preliminarily enjoin enforcement of the Anti-Riot Act to prohibit the Act's application to the conduct of individuals who do not themselves incite, engage in, threaten, or aid and abet violence or property damage;

(c) Enter a declaratory judgment stating that the Act violates Plaintiff's free speech, assembly, petitioning, and due process rights under the First and Fourteenth Amendments to the United States Constitution and article I, sections 12, 14, and 19 of the North Carolina Constitution;

(d) Enter a permanent injunction enjoining the urging provisions of the Act;

(e) Enter a permanent injunction to prohibit the Act's application to the conduct of individuals who do not themselves incite, engage in, threaten, or aid and abet violence or property damage;

(f)    Order Defendants to immediately notify their officers, agents, employees, and other persons in active concert or participation with them, if preliminary or permanent injunctive relief is entered;

(g)    Award Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920 and as otherwise permitted by law; and

(h)    Order such relief as this Court deems just and equitable.

Respectfully submitted this 10th day of April, 2023,

**ACLU OF NORTH CAROLINA**
**LEGAL FOUNDATION**
<u>/s/ Samuel J. Davis</u>
Samuel J. Davis
N.C. State Bar. No. 57289
Kristi L. Graunke
N.C. State Bar No. 51216
P.O. Box 28004
Raleigh, NC 27611
Tel. (Davis): (919) 354-5071
Tel. (Graunke): (919) 354-5066

sdavis@acluofnc.org
kgraunke@acluofnc.org

*Attorneys for Plaintiff*

40