**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| **ACLU OF NORTH CAROLINA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:23-cv-00302** |
| | ) | |
| **JOSH STEIN, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

# PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## INTRODUCTION

Plaintiff American Civil Liberties of North Carolina's (ACLU-NC) members and employees frequently organize and participate in public protests throughout the state. These protests frequently address controversial issues and are the kinds of protests where, in recent years, protestors have been arrested under the Anti-Riot Act ("the Act").

Defendants argue that ACLU-NC lacks standing to challenge the constitutionality of the Act because, they say, it applies only to individuals who personally engage in violence during a protest. Defendants' argument ignores the language chosen by the legislature to define "riot." Where a participant in a public "assemblage" acts violently, the Act deems it a riot—even if the assemblage's other participants are acting peacefully. Neither the Act's text,

nor *State v. Brooks*, 215 S.E.2d 111 (N.C. 1975), contain the definitional limitations claimed by Defendants. Indeed, *Brooks* only confirms the Act's reach: in that case, the North Carolina Supreme Court affirmed the defendant's conviction for engaging in a riot even though he did not personally engage in violence.

ACLU-NC's members and employees risk liability under the Act for their peaceful participation in protests where others are acting violently. ACLU-NC thus has standing to assert that the Act's definition of "riot" is overbroad and vague, and its claims survive Defendants' motions to dismiss.

## STATEMENT OF FACTS

North Carolina's Anti-Riot Act was initially enacted in 1969, as part of a series of laws passed in response to the era's anti-war and civil rights demonstrations. Doc. 25 (Am. Compl.) ¶¶ 43–44. The Act was not significantly amended until H.B. 40 was enacted in 2023. *Id.* ¶ 46. Consistent with the Act's origins, H.B. 40 responds to a recent uptick in highly visible, controversial racial justice protests. *Id.* ¶¶ 50–54, 58–61. H.B. 40 introduced new rioting-related crimes, harsher criminal and civil liability for violations of the Act, and more onerous detention and bond conditions for alleged violators. *See* Doc. 25-1 (H.B. 40). H.B. 40 did not alter the Act's existing definition of "riot." Doc. 25 ¶ 46.

In April 2023, ACLU-NC, a nonprofit organization dedicated to defending and advocating for the constitutional rights of North Carolinians, filed this suit challenging the Act as unconstitutional. Invoking its members' and employees' frequent involvement in public protests, ACLU-NC asserted that the Act's definition of "riot" and its provisions that outlawed "urg[ing] a riot" were overbroad and vague in violation of the First and Fourteenth Amendments and Article I, Sections 12, 14, and 19 of the state constitution. *See* Doc. 1 ¶¶ 1–5, 12–25.

In June, the General Assembly amended the Act to excise prohibitions on "urg[ing] a riot." Doc. 25 ¶ 5. ACLU-NC then amended its complaint to remove language challenging the (now-nonexistent) urging provisions but continued challenging the definition of riot as vague and overbroad. *Id.* ¶¶ 5, 7.

On July 20, Defendant Attorney General Joshua Stein and Defendants District Attorneys Satana Deberry, Lorrin Freeman, and Avery Crump ("the DA Defendants") moved to dismiss ACLU-NC's complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), Docs. 32, 34. The DA Defendants adopted Stein's supporting brief as their own, declining to offer any supplemental briefing. Doc. 35. Plaintiff therefore files this consolidated brief in opposition to both motions.

## ARGUMENT

### I. ACLU-NC has associational and organizational standing.

Defendants contend that ACLU-NC lacks standing to challenge the Act because it does not sufficiently allege an injury-in-fact. Doc. 33 at 8–14. This argument ignores the flexible approach to standing that applies when First Amendment rights are implicated. ACLU-NC has standing to challenge the Act because its members and employees regularly participate in protest activities that are arguably encompassed by the Act's prohibitions. In doing so, they credibly risk arrest, prosecution, and civil liability. These risks are heightened by H.B. 40's recent amendments to the Act.

To establish standing, a plaintiff must allege an injury that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (cleaned up). Standing requirements "are somewhat relaxed in First Amendment cases." *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013). "The leniency of First Amendment standing manifests itself most commonly in the doctrine's first element: injury-in-fact." *Id.*

Where a criminal statute implicates First Amendment rights, a plaintiff in a pre-enforcement challenge "satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a

credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. United Farm Workers*, 442 U.S. 289, 298 (1979)).

Alternatively, a plaintiff can establish standing by demonstrating that the law chills their rights to speak and assemble. *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) "[T]here is a presumption that a non-moribund statute that facially restricts expressive activity by the class to which the plaintiff belongs presents such a credible threat." *Id.* This presumption "is particularly appropriate when the presence of a statute tends to chill the exercise of First Amendment rights." *Id.* (internal quotations omitted). A credible threat exists "so long as the threat is not imaginary or wholly speculative, chimerical, or wholly conjectural." *Id.* (cleaned up). *See also Hickory Fire Fighters Ass'n v. City of Hickory, N. C.*, 656 F.2d 917, 922 n.5 (4th Cir. 1981) ("The proper test for standing in this context . . . is not whether a plaintiff has been arrested or otherwise punished for exercising First Amendment rights in violation of the ordinance, but whether the plaintiff faces 'realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.'" (quoting *Babbitt*, 442 U.S. at 298)).

As set forth below, ACLU-NC has standing to challenge the Act based on (1) activities of its members and employees that plausibly fall within the scope of the Act's prohibitions; and (2) the presumptive chilling effect of the Act.

### A. ACLU-NC members regularly engage in activities that are plausibly encompassed by the Act.

An organization has associational standing (1) "when at least one of its identified members would otherwise have standing to sue in their own right," (2) "the interests at stake are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, 983 F.3d 671, 683 (4th Cir. 2020) (cleaned up).

Defendants don't dispute that ACLU-NC satisfies the latter two requirements. ACLU-NC is a membership-based organization dedicated to preserving constitutional rights, and its members and employees regularly organize and participate in public protests on civil rights issues. Doc. 25 ¶¶ 12-21. The right to protest in public without risking arrest, prosecution, or civil liability is central to ACLU-NC's civil rights advocacy mission. *See id.* ¶¶ 21, 23–25.

Nor is the individual participation of ACLU-NC members required for this litigation. ACLU-NC aims to enjoin an unconstitutional statute and does not seek damages or other individualized forms of relief. *See Outdoor Amusement*, 983 F.3d at 683 (where organization sought injunction that would benefit many of its members, individual participation was unnecessary).

1. ACLU-NC members have standing because the definitional provision plausibly encompasses their expressive activities.

Defendants contend that ACLU-NC lacks standing because it hasn't pleaded that its members have violated the Act before or will do so in the future. Doc. 33 at 9. Defendants' analysis ignores the broad sweep of the Act's definition of "riot":

> a public disturbance involving an assemblage of three or more people which by disorderly and violent conduct, or the imminent threat of disorderly and violent conduct, results in injury or damage to persons or property or creates a clear and present danger of injury or damage to persons or property.

N.C. Gen. Stat. § 14-288.2(a). This text contemplates that where there is a "public disturbance involving" a gathering of three or more people, and that assemblage results in injury or damage or creates "a clear and present danger" of injury or damage, any one of the individuals "willfully engag[ing]" in this assemblage has committed a crime—regardless of whether that person personally engaged in or incited violence. *Id.* § 14-288.2(b).

Defendants attempt to insert a requirement that to be "engaged in rioting," each individual participant in the assemblage must act violently. This overlooks the legislature's choice of phrasing—"a public disturbance involving an assemblage of three or more people *which* by disorderly and violent conduct . . . results in injury or damage," *id.* (emphasis added), not "a public

disturbance involving an assemblage of three or more people *who* by disorderly and violent conduct . . . results in injury or damage."

The use of "which" refers to "the assemblage," not individuals within the assemblage, making any member of that assemblage liable for rioting, regardless of their individual acts. If the legislature had intended that only individuals who were themselves acting violently be charged with rioting, they would have used "who" instead of "which." *See, e.g., Nelson v. Miller*, 170 F.3d 641, 653 n.8 (6th Cir. 1999) ("By the use of the term "which," rather than "who," the sentence clearly alleges that the *State of Michigan,* rather than the Secretary of State, receives federal financial assistance."); *cf. United States v. Carolawn Co., Inc.*, No. CV 83-2162-0, 1984 WL 1083050, at *3 (D.S.C. June 15, 1984) (statutory use of "who" instead of "which" "connote[s] individual, personal involvement").

ACLU-NC alleges that its members frequently engage in public "assemblages" encompassed by the Act's definition of riot, and identifies two such members. Doc. 25 ¶¶ 13–32. Under the Act, ACLU-NC members who peacefully participate in a protest where some members of the assemblage engage in violent conduct may plausibly be charged with rioting. Given the unpredictable nature of public demonstrations, the controversial issues on which ACLU-NC members advocate, and the fact that peaceful protestors

(including ACLU-NC employees) have been arrested in the recent past[1] while engaging in protests, the risk to ACLU members and employees is substantial and realistic. *Id.* ¶¶ 30–32, 77–80.

The Act inflicts injury-in-fact because it puts ACLU-NC members at risk of arrest and prosecution by officials who read the statute expansively—discouraging ACLU-NC members from participating in protests. Defendants' contention that ACLU-NC must assert an intent to engage in a specific course of proscribed conduct, *see* Doc. 33 at 9, has already been rejected by the Fourth Circuit.

In *Kenny v. Wilson*, several schoolchildren alleged that South Carolina's disorderly conduct statute and similar "Disturbing Schools" statute were unconstitutionally vague. Defendants argued that the plaintiffs lacked standing because they "fail[ed] to allege an intent to engage in a specific course of conduct proscribed by the statutes." 885 F.3d at 291. The Court disagreed:

> [I]t is precisely because the statutes are so vague that plaintiffs can't be more specific. Plaintiffs allege that they can be criminally prosecuted for just about any minor perceived infraction and that they can't predict the type of conduct that will lead to an arrest. In any event, plaintiffs don't need to allege a specific intent to violate the statutes for purposes of standing.

[1] Defendants point out that the protest-related arrests of ACLU-NC employees involved charges of failure to disperse, not rioting. Doc. 33 at 12. Given that a plaintiff doesn't have to actually violate a statute to have standing to challenge it, this distinction is immaterial. *See Kenny*, 885 F.3d at 288.

*Id.*[2]

So too here. Although H.B. 40 clarifies that "mere presence alone without an overt act" is insufficient for a conviction (*see* North Carolina Session Law 2023-6, Section 1 (to be codified as N.C. Gen. Stat. § 14-288.2(g)), the Act's definition of riot still permits ACLU-NC members to be arrested and prosecuted for a large swath of non-violent (but overt) acts.

Would-be protestors cannot predict with certainty whether violence will occur at a public demonstration. An ACLU-NC member who waves a sign, raises a fist symbolically in the air, or offers a flower to police, while other protestors are behaving violently, risks liability. Given recent examples of violence at otherwise lawful protests, (*see* Doc. 25. ¶¶51–53),[3] there is a

---

[2] Defendants incorrectly assert that *Kenny* requires plaintiffs to plead an intent to engage in conduct that would inevitably violate the law at issue. Doc. 33 at 9. The court in Kenny observed that such allegations supported standing. 885 F.3d at 288, 291, but did not suggest such allegations were required. Any such requirement is inconsistent with other precedents including the Supreme Court's recent decision in *303 Creative LLC v. Elenis*. *See* 143 S.Ct. 2298, 2308–10 (2023) (plaintiff had standing to challenge a public accommodations law even though she had yet to commence the activities she claimed would put her at risk of enforcement).

[3] Defendant states that ACLU-NC "alleges that its members intend to engage in non-violent protests," citing to various paragraphs of the complaint. Doc. 33 at 9. This characterization does not accurately reflect what these paragraphs say. While ACLU-NC leadership does not urge violent protest (*see* Doc. 25 ¶ 14), and while individual ACLU-NC members may intend to act peacefully and participate in protests they believe will be peaceful, they cannot control the actions of other participants. *See id.* ¶¶ 51-52.

plausible risk that ACLU-NC members and employees engaging in peaceful "overt acts" in proximity to others' violent activities will be arrested for rioting.

Because ACLU-NC members face a credible threat of arrest or prosecution under the Act's definition of "riot," ACLU-NC has associational standing to challenge the Act.

2. North Carolina court decisions don't obviate ACLU-NC's injury.

Defendants allege that in *State v. Brooks*, 215 S.E.2d 111 (N.C. 1975), the North Carolina Supreme Court provided "an authoritative construction of the word 'riot' that precludes ACLU-NC's reading," thus ensuring that any risk of injury is remote. Doc. 33 at 2.

Here again, Defendants' argument eschews textual analysis in favor of vague reassurance. The language and outcome of *Brooks* do not support Defendants' position. The defendant in *Brooks* did allege that the Act's definitional provision was vague, but for reasons different from those ACLU-NC argues here. *See* 215 S.E.2d at 117–18. In rejecting Brooks' overbreadth challenge, the court reasoned: "[A] public disturbance involving three or more people, no matter how noisy or boisterous, cannot, under the statutory definition, be a riot unless violence or the threat of immediate violence which poses a clear and present danger to persons or property is present." *Id.* at 118.

This is not a narrowing construction of the definition of riot—or at least not one that addresses the specific concerns raised by ACLU-NC. *Brooks*

doesn't answer whether an individual may be convicted of rioting for their non-violent participation in an assemblage where others act violently. Defendants argue that the Supreme Court "construed the definitional provision to require a showing that the defendant engaged in or threatened violence." Doc. 33 at 11. But they quote no language from *Brooks* supporting this interpretation, and there is none: the court explained that violence or the threat thereof must be *"present*" at the assemblage, 215 S.E.2d at 118, without requiring a finding that the defendant personally be a perpetrator.

Moreover, the language most relied on by Defendants relates only to Brooks' conviction on the charge of *inciting a riot*. The court overturned this conviction because the charging document alleged only that the defendant urged three or more people to gather in front of a school:

> Any statute that would permit the State to convict an individual for urging three or more people to assemble in a public place would be constitutionally impermissible. Our riot act clearly does not encompass such activity. In fact, the scope of the act in no way infringes upon the freedom of nonviolent assemblage.

*Id.* at 119.

This language establishes that merely urging people to assemble is not a riot. But it doesn't answer ACLU-NC's specific question: whether the Act is vague and overbroad because it reaches an individual's non-violent participatory conduct in an assemblage that *is violent* because *other* members

of the assemblage are acting violently. *See, e.g.*, *Kenny*, 885 F.3d at 290–91 (plaintiffs had standing to challenge South Carolina's disorderly conduct statute where the state court of appeals had rejected similar challenges but did not resolve the specific interpretative question raised by the plaintiffs).

Indeed, *Brooks* demonstrates how the Act's definition of riot can unconstitutionally reach non-violent protestors based on their proximity to violent acts, and how the Act is prone to arbitrary and discriminatory enforcement. The North Carolina Supreme Court affirmed Brooks' conviction for engaging in a riot based on his involvement in a gathering that included Brooks (then chief of the Tuscarora Tribe) and leaders of the American Indian Movement. *Brooks*, 215 S.E.2d at 114. The group — "most of whom were Indians"— hoped to enter a school building to hold a meeting, but they were refused access. *Id.*

Brooks gathered with about 200 other people on the grounds of a church across the road from the school. *Id.* at 114–15. In response, about 60 law enforcement officers, many in riot gear, assembled in front of the school. *Id.* As the night wore on, individuals other than Brooks began acting violently and causing damage to property. *Id.* Brooks' actions were described as follows:

> *[T]he officers could not hear what defendant was telling the crowd*. However, when he spoke, officers could see members of the crowd 'stick their arms up in the air' and could hear them yell out 'Red Power.' Also,

> during the speeches, various groups in the crowd would sing such songs as 'We Shall Overcome.'

*Id.* at 115 (emphasis added).

Some members of the group — not Brooks — began to throw bottles and started to cross the street to where the officers stood:

> When this happened, defendant would call them back, telling them not to cross the road until he made his decision and that when he made his decision, they were going across to the school grounds. Defendant also announced to the officers that if any of 'his people' were injured, then he would 'declare war on Robeson County.'

*Id.*

The crowd was directed to disperse, but Brooks remained with about 50 others. *Id.* at 115–16. They were arrested. *Id.* The police then discovered several weapons on the church side of the road—none of which were linked to Brooks.[4] *Id.* at 116. For his role in the incident, Brooks was convicted of failure to disperse, as well as engaging in and inciting a riot pursuant to the Act. *Id.* The court of appeals affirmed the convictions for engaging in a riot and inciting

---

[4] These items were nonetheless deemed admissible as evidence of Brooks' guilt, underscoring that the Act's definition of "riot" allows for conviction on a constitutionally impermissible guilt-by-proximity theory. *See id.* at 121–22 ("[T]he capacity of members of the assemblage to inflict injury or damage to persons or property or to create the clear and present danger of such injury or damage is material to the crime of riot and is relevant to establish the proposition defendant was engaged in a riot.")

a riot. *Id.* at 113.[5] The North Carolina Supreme Court affirmed Brooks' conviction for engaging in a riot and reversed his incitement conviction (*see* discussion *supra* at 12-13). *Id.* at 119.

Given this context, *Brooks*'—and Defendants'—summary assurances that the Act's definition of riot is not "constitutionally impermissible" does not defeat ACLU-NC's standing. *Id.* at 118. *Brooks* creates, rather than resolves, ambiguity about whether ACLU-NC members can be prosecuted for activity protected by the First Amendment. *See Kenny*, 885 F.3d at 290–91.

Seven years after *Brooks*, the U.S. Supreme Court held in *NAACP v. Claiborne Hardware* that the First Amendment prohibits peaceful protestors from being held liable for fellow protestors' violence. 458 U.S. 886 (1982). *Claiborne* significantly undermines the North Carolina Supreme Court's affirmance of Brooks' conviction — and by extension its determination that the Act's definition of "riot" comports with the First Amendment.

Defendants point to subsequent state court of appeals dicta that they allege narrows the Act's reach, but these cases also fail to address the issue raised by ACLU-NC. *See, e.g., State v. Mitchell*, 429 S.E.2d 580, 582–83 (N.C. App. 1993) (acknowledging "sparse" caselaw interpreting the Act and affirming rioting conviction because defendant, who had resisted arrest and assaulted

[5] The court of appeals remanded for a new trial on the failure to disperse charge. *Id.* at 113.

an officer, deliberately ran into a table "upon which the officer was standing while the riot was taking place"); *State v. Riddle*, 262 S.E.2d 322, 324 (N.C. App. 1980) ("[M]ere presence at the scene of a riot may not alone be sufficient to show participation in it.").

Because none of these cases resolve the constitutional questions raised by ACLU-NC in this case, ACLU-NC has standing to challenge the statute.

3. H.B. 40's Recent Amendments to the Act Expose ACLU-NC Members to Greater Risk of Injury.

Defendants contend that because the definitional provision is longstanding and unaltered by H.B. 40, ACLU-NC cannot demonstrate its activities are chilled by the statute. As noted above, chilling effect is not mandatory for standing — it is sufficient that ACLU-NC members' activities fall within the reach of the statute, as ACLU-NC has plausibly alleged. Doc. 25 ¶¶ 13-21. But ACLU-NC has also alleged chilling effect and the likelihood that members will curtail their protest activities to avoid arrest or prosecution. *See id.* ¶¶ 25, 27, 29, 32, 87, 95–96.

ACLU-NC's fear of liability is well-founded. Far from being moribund, the Act has been enforced vigorously in recent years. *Id.* ¶¶ 77–78. Notwithstanding Defendants' claim that ACLU-NC improperly bases its standing on rioting arrests of non-members (Doc. 33 at 13), the fact that other peaceful protestors were arrested attests to the reasonableness of ACLU-NC's

fear that its members will suffer the same. *See 303 Creative LLC v. Elenis*, 143 S.Ct. 2298, 2308–10 (2023) (plaintiff credibly feared that law would be enforced against her given the state's record of enforcement against others); *Cap. Associated Indus., Inc. v. Stein*, 283 F. Supp. 3d 374, 381 (M.D.N.C. 2017), *aff'd*, 922 F.3d 198 (4th Cir. 2019) ("Since State Prosecutors have not refused to enforce the [unauthorized practice of law] Statutes, [plaintiff wishing to engage in the practice of law] faces a credible threat of prosecution."); *Hoffman v. Hunt*, 845 F. Supp. 340, 347 (W.D.N.C. 1994) (where a trespass law was "alive and well, and backed by a State poised to fully enforce it and a known constituency very eager to have it enforced," plaintiffs had standing ).

The Act's chilling effect is especially powerful because the changes introduced by H.B. 40 dramatically escalate the risks of an arrest, prosecution, or civil lawsuit arising from alleged rioting. H.B. 40 itself stands as strong evidence of increased interest in arresting, prosecuting, and suing protestors for purported rioting. And the General Assembly's willingness to openly defy Supreme Court and Fourth Circuit precedent by enacting prohibitions on "urging a riot" (until ACLU-NC sued) demonstrates the likelihood of unconstitutional prosecutions of protestors in the current political climate. *See, e.g.,* Doc. 25 ¶¶ 2-5. In a similar context, the Fourth Circuit held that the plaintiffs had standing to challenge North Carolina's longstanding, rarely enforced, but recently amended abortion ban. *See Bryant v. Woodall*, 1 F.4th

280, 287 (4th Cir. 2021) ("[T]he North Carolina legislature's recent revisions to its statutory scheme suggest that North Carolina has a renewed interest in regulating abortion.'").

H.B. 40's harsher criminal penalties for those accused of "rioting" further amplify its chilling effect. North Carolina Session Law 2023-6, § 1 (to be codified as N.C. Gen. Stat. § 14-288.2(c)–(e1). Even individuals who are charged with misdemeanor "engaging in a riot" are subject to extended detention before pre-trial release will be granted, as well as more onerous bond conditions. *See id.* § 4 (to be codified as § 15A-534.8). Additionally, "[a]ny person whose person or property is injured by reason of a violation" of the Act may sue the violator for treble damages and recover costs and attorneys' fees. *Id.* § 14-288.2(f).

These heightened consequences apply to *all* violations of the Act. ACLU-NC alleges that when these new provisions take effect December 1, the Act is very likely to chill the protests of ACLU-NC members and employees.[6] Doc. 25 ¶¶ 25-32, 94-96.

---

[6] As Defendants acknowledge, ACLU-NC need not demonstrate that its members will cease protesting because of this risk. *See* Doc. 33 at 10; *Benham v. City of Charlotte, N.C.*, 635 F.3d 129, 135 (4th Cir. 2011). The enhanced penalties created by H.B. 40, as well as the politicized interest in prosecuting participants in Black Lives Matter protests (among other protests in which ACLU-NC members and employees have participated over the past three years) amply "deter a person of reasonable firmness from exercise of First Amendment rights." *Id.* (internal quotations omitted).

### B. ACLU-NC has organizational standing because its employees engage in activities plausibly encompassed by the Act.

For similar reasons, ACLU-NC has standing to sue on its own behalf. An organization "may suffer an injury in fact when a defendant's actions impede its efforts to carry out its mission." *Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012). Organizing and participating in protests, as well as ensuring that individuals can participate vigorously in public demonstrations, are core functions of ACLU-NC's mission and work. Doc. 25 ¶¶ 12–29. ACLU-NC has standing because it will expend organizational resources to provide guidance on avoiding liability, especially in the context of ACLU-NC-sponsored events. *Id.* ¶¶ 13–21. ACLU-NC employees have been arrested in the past while participating in protests, and ACLU-NC has paid defense costs for those believed to be wrongly arrested in the scope of employment. *Id.* ¶¶ 30–31. H.B. 40's new civil liability provision poses a particular threat to ACLU-NC if its employees are sued for protest activities conducted while on the job. These factors will impair ACLU-NC's expressive and associative activities, likely curtailing its participation in certain demonstrations. *Id.* ¶¶ 24–37.

ACLU-NC has credibly alleged that the Act will tangibly impact not just its finances, but its mission of defending and advancing constitutional rights through tactics like public protests. *Id.* ¶¶ 12-32. This suffices for organizational standing. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363,

379 (1982) (organization had standing where defendants' discriminatory practices impaired its ability to provide services to low-income home-seekers and organizations diverted resources to address the defendants' unlawful practices); *People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Maryland, Inc.,* 843 Fed. App'x 493, 496–97 (4th Cir. 2021) (PETA had standing because "its mission is to protect animals from abuse, neglect, and cruelty" and its diversion of resources to investigate and submit complaints about a particular zoo "impeded PETA's efforts to carry out its mission"); *N. Carolina A. Philip Randolph Inst. v. N. Carolina State Bd. of Elections*, No. 1:20CV876, 2022 WL 446833, at *7 (M.D.N.C. Feb. 14, 2022) (organizations dedicated to increasing voter participation had standing where "the time and resources used to address fears surrounding the enforcement of the challenged [voting] statute is time away from Plaintiffs' get-out-the-vote activities.").

## II. <u>ACLU-NC Sufficiently Alleges that the Act's Definition of Riot is Unconstitutionally Vague and Overbroad.</u>[7]

### A. The definitional provision encompasses a substantial amount of expressive conduct and imposes guilt-by-association.

ACLU-NC pleads a plausible claim that the Act's definitional provision is overbroad in violation of the First Amendment. *See* Doc. 25 ¶¶ 91–98. Defendants seek dismissal, claiming that (1) the Act, narrowed by *Brooks*, does not allow such a result; and (2) any protected speech reached by the Act is "negligible." Doc. 33 at 15–19. Defendants are wrong on both counts.

When assessing overbreadth claims, courts "evaluate the ambiguous as well as the unambiguous scope of the [challenged] enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc*, 455 U.S. 489, 494 n.6 (1982). As discussed *supra* at 7–11, under the definitional provision, neither intent to support

---

[7] In footnotes, Defendants argue that ACLU-NC's parallel claims under the state constitution are barred by Eleventh Amendment immunity under the *Pennhurst* doctrine. Doc. 33 at 15 n.3, 19–20 n.4. ACLU-NC's state constitutional claims survive because the North Carolina Supreme Court's decision in *Corum v. University of North Carolina*, 330 N.C. 761 (1992) waived Eleventh Amendment sovereign immunity for such claims. *Guseh v. N. Carolina Cent. Univ.*, No. 1:04CV00042, 2006 WL 694621, at *1 n.1 (M.D.N.C. Mar. 13, 2006).

Defendants rely on the magistrate judge's decision in *Guseh v. N.C. Central Univ.*, 423 F. Supp. 2d 550, 561 (M.D. N.C. 2005), but this portion of the magistrate's order was rejected by the district judge. *See Guseh*, 2006 WL 694621, at *1 n.1. Summarily affirming, the Fourth Circuit specifically repeated—and took no issue with—the district judge's *Corum*-based reasoning. *Guseh v. N. Carolina Cent. Univ. ex rel. Bd. of Governors of Univ. of N. Carolina*, 206 F. App'x 255 n.* (4th Cir. 2006).

unlawful conduct nor personal involvement in violence is necessary for liability. Because the statute requires only that the "assemblage" be violent or disorderly, anyone who willfully incites or engages in any public protest where violence or disorderly conduct occurs may be punished, even if that person's own conduct was entirely peaceful and they lacked intent to help others violate the law.

1. *Brooks* Does Not Prevent the Act's Application to Protected Speech.

"[G]uilt by association alone, without (establishing) that an individual's association poses the threat feared by the Government, is an impermissible basis upon which to deny First Amendment rights." *Healy v. James*, 408 U.S. 169, 186 (1972) (internal quotation omitted). Yet, the Act's definition of riot punishes individuals who peacefully participate in public demonstrations based solely on the conduct of others.

Defendants contend that *Brooks* provides a binding interpretation of the Act that protects the First Amendment rights of non-violent protestors and precludes ACLU-NC's facial challenge. At best, *Brooks* conclusorily states that the Act does not reach "activity protected by the First Amendment" or "infringe[] on the freedom of nonviolent assembly." 215 S.E. 118, 119. These general statements are insufficient because they fail to address ACLU-NC's specific argument. *See Kenny*, 885 F.3d at 290 (state appellate court decision

interpreting statute did not foreclose vagueness and overbreadth claims because it did not resolve the specific interpretation issues raised by plaintiffs).

At worst, *Brooks*' holding reinforces, rather than obviates, the danger of guilt-by-association liability under the Act. The North Carolina Supreme Court's decision to affirm the rioting conviction of Brooks—who led a protest that turned riotous but who did not himself engage in violence—is incompatible with the U.S. Supreme Court's later decision in *Claiborne*. There, the Mississippi Supreme Court concluded that individuals who organized a boycott of white businesses could be held liable for violence by boycott participants, even absent evidence that the organizers personally engaged in unlawful conduct. 458 U.S. at 894–95.

The U.S. Supreme Court reversed. Although "[t]he First Amendment does not protect violence," *id.* at 916, the organizers' right to associate for expressive purposes "does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected," *id.* at 908.

When violence occurs during a protest, the First Amendment "restricts the ability of the State to impose liability on an individual solely because of his association with another." *Id.* at 918–19. If an individual member of a protest does not personally engage in unprotected speech or conduct, the state must

"establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." *Id.* at 920.

The Anti-Riot Act is irreconcilable with *Claiborne*. Under the definitional provision, if an individual organizes or peacefully participates in a lawful demonstration, but that demonstration "*involv[es]*" violence or disorderly conduct perpetrated by another participant which "*results in* injury or damage to persons or property," N.C. Gen. Stat. § 14-288.2(a) (emphasis added), that individual could be held liable for engaging in a riot, *id.* § 14-288.2(b). *Claiborne* holds that the First Amendment requires proof of an individual's own unlawful conduct or intent to support a group's unlawful aims to impose liability. Yet the Anti-Riot Act—as defined statutorily by the legislature and as construed by North Carolina courts—demands neither.

2. <u>The protected activity encompassed by the definitional provision is substantial.</u>

The protected speech criminalized by the Act is substantial; these harms aren't mitigated by HB 40's addition of language that "mere presence alone without an overt act" cannot constitute rioting. *See supra* at 10–11. Even with this recent addition — which merely codifies the court of appeals' dicta in *Riddle*, 262 S.E.2d at 324 — the Act could plausibly apply to individuals who participate in public protests near violence or disorderly conduct they neither support nor participate in, while engaging in a virtually endless list of non-

violent yet overt acts. *See Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1276–77 (N.D. Fla. 2021) (rejecting argument that section of anti-riot statute declaring "this section does not prohibit constitutionally protected activity such as a peaceful protest" saved the statute from unconstitutional ambiguity). In so doing, the Act criminalizes "a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (cleaned up). ACLU-NC states a plausible claim that the Act violates the First Amendment.

### B. The definitional provision fails to provide adequate notice to protestors and enables discriminatory enforcement.

ACLU-NC also sufficiently alleges that the Anti-Riot Act is vague in violation of the Due Process Clause of the Fourteenth Amendment. Doc. 25 ¶¶ 82–90. A criminal law "must give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019) (en banc).

Where, as here, vagueness "threatens to inhibit the exercise of constitutionally protected rights . . . . a more stringent vagueness test" applies. *Vill. of Hoffman Ests.*, 455 U.S. at 499. Courts must "take into account possible applications of the statute in other factual contexts" to assess whether the law could sweep in protected speech. *NAACP v. Button*, 371 U.S. 415, 432–33

(1963). A vague statute that impinges on constitutional rights "can be invalidated on its face even where it could conceivably have some valid application." *See Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012).

ACLU-NC has adequately pleaded a vagueness claim by alleging that it is unclear whether, and under what circumstances, a protestor could be liable for overt (but peaceful) participation in a demonstration where violence occurs. Doc. 25 ¶¶ 86–87; *see, e.g., Dream Defenders*, 559 F. Supp. 3d at 1281 (anti-riot law was likely unconstitutionally vague where it was unclear whether protestors had "a duty to stop expressing their views and leave the scene at the first sign of a potential riot," or whether the statute would make it illegal for a protestor to peacefully raise a sign or film police conduct once the protest turned violent). ACLU-NC further asserts that this ambiguity grants the state excessive discretion enforcement, engendering a risk of discriminatory enforcement. Doc. 25 ¶¶ 103–05.

The Act lacks definitional guardrails to prevent arbitrary enforcement or prosecution for constitutionally protected expressive conduct. Where laws state that an individual must have themselves committed or intentionally contributed to an act of violence to be convicted of rioting, the laws have

(rightfully) survived facial vagueness challenges.[8] By contrast, North Carolina's Anti-Riot Act is silent regarding what intent a defendant must have acted with and whether a defendant must have personally engaged in violent or disorderly conduct.

*Brooks* does not provide the requisite clarity. The vagueness challenge raised and rejected there was based entirely on the defendant's assertion that the Act's definition was "complex" and "requires cross-reference to an 'interlocking maze of statutory descriptions.'" 215 S.E.2d at 117–18. *Brooks,* therefore, does not address, much less resolve, the vagueness problem identified by ACLU-NC. If anything, the conviction of a Native American leader arising from a confrontation between riot-clad police, members of the Tuscarora tribe, and representatives of the American Indian Movement, provides historical perspective on how the Act's broad definition of riot has been used to target controversial speakers.

---

[8] Defendants point to the Fourth Circuit's rejection of a vagueness challenge to the federal anti-riot act in *United States v. Miselis*, 972 F.3d 518, 544–46 (4th Cir. 2020). There, defendants convicted of rioting argued that the statute was vague because of its definition of "public disturbance," an argument ACLU-NC does not make here. *Id.* Other cases cited by Defendants (Doc. 33 at 20) are similarly inapposite, either because the statutes at issue require: proof that a defendant shared a mutual intent or acted in concert with others who engaged in violent or disorderly conduct; proof that a defendant personally engaged in violent or disorderly conduct; or proof that a defendant knowingly acted with specific intent to participate in a riot.

Because ACLU-NC plausibly alleges that the definitional provision does not provide adequate notice as to what overtly participatory acts count as rioting, and is subject to arbitrary enforcement, its vagueness challenge to the Act should proceed.

## CONCLUSION

For the reasons stated, Defendants' Motions to Dismiss should be denied.

Respectfully submitted,

/s/ Kristi L. Graunke
Kristi L. Graunke
N.C. State Bar No. 51216
Samuel J. Davis
N.C. State Bar. No. 57289
Michele Delgado
N.C. State Bar No. 50661
ACLU OF NORTH CAROLINA
LEGAL FOUNDATION
P.O. Box 28004
Raleigh, NC 27611
Tel. (Graunke): (919) 354-5066
Tel. (Davis): (919) 354-5071
Tel. (Delgado): (919) 256-5891
kgraunke@acluofnc.org
sdavis@acluofnc.org
mdelgado@acluofnc.org

*Attorneys for Plaintiff*

## CERTIFICATE OF WORD COUNT

Pursuant to L.Cv.R. 7.3(d), I hereby certify that this brief is no more than 6,250 words, as calculated by the word processing software used to prepare this brief.

/s/ Kristi L. Graunke

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed in in the U.S. District Court for the Middle District of North Carolina on this 10th day of August 2023 using the Clerk's CM/ECF system, which will send notification of this filing to counsel for all parties.

/s/ Kristi Graunke